United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL ASSOCIATION OF MANUFACTURERS, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Case No. 20-cv-04887-JSW

**ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Re: Dkt. No. 31

Now before the Court is a motion for a preliminary injunction filed by the National Association of Manufacturers, Chamber of Commerce of the United States of America, National Retail Federation, Technet, and Intrax, Inc. (collectively "Plaintiffs"). The Court has considered the parties' papers, relevant legal authority, the parties' arguments at the hearing, and the full record provided in the case.[1] For the reasons that follow, the Court GRANTS Plaintiffs' motion.

On June 22, 2020, the President issued Presidential Proclamation 10052 ("Proclamation 10052" or "the Proclamation"), which suspends entire visa categories for four sets of nonimmigrant work visas for a period lasting until December 13, 2020, and with discretion to be continued "as necessary." The Proclamation is entitled *Suspension of Entry of Immigrants and*

[1] The Court also considered the five amicus curiae briefs from: (1) a group of 33 immigration law professors (Dkt. No. 40-1); (2) a group of 33 leading companies and business organizations (Dkt. No. 45-1); (3) a diverse group of organizations and companies including the Society for Human Resource Management (Dkt. No. 56-3): (4) U.S. Tech Workers (Dkt. No. 67-1); and, (5) Worldwide Employee Relocation Council (Dkt. No. 77-1).

*Nonimmigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*. The stated purpose of the Proclamation is to eliminate the threat of taking jobs from American citizens who may find themselves without employment during the "extraordinary economic disruptions caused by the COVID-19 outbreak." 85 Fed. Reg. 38,263 at 38,264 (June 25, 2020).

Broadly speaking, the visa categories at issue here provide for: (1) intra-company transfers to non-citizens already employed by American businesses; (2) highly-skilled workers coming to America temporarily to perform services in a specialty occupation for which they are uniquely qualified; (3) seasonal laborers responding to proven domestic labor shortages; and, (4) cultural exchange visitors in a variety of work-study programs nationwide. The question presented to the Court for its review is not whether the Proclamation is good public policy, but rather (1) whether the stated legal basis for the issuance of the Proclamation is supported by law, and (2) whether the stated factual premise for the issuance of the Proclamation is supported by the evidentiary record, including the findings within the Proclamation itself.

## BACKGROUND

### A. Factual Background.

On April 22, 2020, the President signed Proclamation 10014 ("Proclamation 10014"). *See* Presidential Proclamation 10014, *Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 23,441 (Apr. 27, 2020). Proclamation 10014 suspended the entry of all immigrants into the United States for 60 days unless they qualified for an exception to the Proclamation. Proclamation 10014 also directed "[w]ithin 30 days of the effective date of this proclamation, the Secretary of Labor and the Secretary of Homeland Security, in consultation with the Secretary of State, shall review nonimmigrant programs and shall recommend . . . other measures appropriate to stimulate the United States economy and ensure the prioritization, hiring, and employment of United States workers." *Id.* at 23,442.

Two months later, on June 22, 2020, the President issued Proclamation 10052 – the proclamation at issue in this matter – extending the suspension of entry pursuant to Proclamation

10014 through December 31, 2020, with discretion to continue its efficacy "as necessary." *See* 85 Fed. Reg. at 38,263. The President explained that the extension was necessary as the 60-day timeframe set by Proclamation 10014 was insufficient for the United States labor market to stabilize and that "the considerations present in Proclamation 10014 remain." *Id.*

In addition to extending the suspension of entry of immigrants, Proclamation 10052 also suspended entry of foreign nationals seeking admission on temporary nonimmigrant visas, with limited exceptions. The President announced that the Secretary of Labor and the Secretary of Homeland Security, having reviewed the nonimmigrant programs as formerly directed, had "found that the present admission of workers within several nonimmigrant visa categories also poses a risk of displacing and disadvantaging United States workers during the current recovery." *Id.* The Proclamation states that "[u]nder ordinary circumstances, properly administered temporary worker programs can provide benefits to the economy. But under the extraordinary circumstances of the economic contraction resulting from the COVID-19 outbreak, certain nonimmigrant visa programs authorizing such employment pose an unusual threat to the employment of American workers." *Id.* The Proclamation states that "[t]he entry of additional workers through the H-1B, H-2B, J, and L nonimmigrant visa programs . . . presents a significant threat to the employment opportunities affected by the extraordinary economic disruptions caused by the COVID-19 outbreak." *Id.* at 38,264. The President, exercising his authority under 8 U.S.C. sections 1182(f) and 1182(a), "determined that entry, through December 31, 2020, of certain aliens as immigrants and nonimmigrants would be detrimental to the interests of the United States," including suspension of all H-1B, H-2B, J, and L nonimmigrant temporary workers. *Id.*

Defendants U.S. Department of State and U.S. Department of Homeland Security are charged with implementing the entry ban on nonimmigrant workers as set forth in Section 2 of the Proclamation. The U.S. Department of State has ceased processing or issuing visas in the impacted categories during the time the Proclamation has been in effect. The U.S. Department of Homeland Security also has paused the processing of certain new nonimmigrant visa applications.

United States District Court
Northern District of California

**1. Visa Categories at Issue.**

The Immigration and Nationality Act ("INA") governs the admission of noncitizens into the United States. *See generally*, 8 U.S.C. §§ 1101, *et seq*. Specifically, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and/or for limited and specific purposes. *See id.* §§ 1101(a)(15); 1184. The Proclamation at issue here eliminates these nonimmigrant visa categories.

**a. L Visa Category.**

The L visa category allows multinational corporations to sponsor visas for temporary intra-company transfers to the United States. These visas are issued to noncitizens who have "been employed continuously for one year by a firm or corporation . . . and who seek[] to enter the United States temporarily in order to render [their] services to the same employer" and will perform a "managerial" or executive" function (L-1A visas) or have certain "specialized knowledge" about the company's product or processes and procedures (L-1B visas). *See id.* §§ 1101(a)(15)(L); *id*. § 1184(c)(2)(B) (defining "specialized knowledge"); *see also* 8 C.F.R. §§ 214.2(l)(1)(ii)(B)-(D). L-2 visas are available for accompanying spouses and minor children. 8 U.S.C. § 1101(a)(15)(L).

**b. H Visa Category.**

The H1-B visa category enables employers in the United States to hire qualified foreign professionals in "specialty occupation[s]" requiring "theoretical and practical application of a body of highly specialized knowledge" and a "bachelor's or higher degree." *Id*. §§ 1184(i)(1), 1101(a)(15)(H)(i)(b). Prior to hiring a H1-B nonimmigrant, an employer must first file a labor condition application with the Department of Labor and must identify the specialty occupation position and the specific location of employment. In its application, the employer must also attest that the position will pay a prevailing wage, that the position will not adversely affect other workers, and that the company has provided certain forms of notice regarding the position. *Id.* §§ 1182(n)(1)(A)-(D). New H1-B visas are capped at 65,000 per year, with an additional 20,000 positions available to individuals with an advanced degree earned from a higher education institution within the United States.

The H2-B visa category enables employers in the United States to hire foreign nationals "to perform . . . temporary service of labor" in non-specialized, non-agricultural sectors, "if unemployed persons capable of performing such service or labor cannot be found in this country." *Id*. at § 1101(a)(15)(H)(ii)(b); *see also* 8 C.F.R. § 214.2(h)(6). In order to hire a H2-B employee, an employer must certify to the Department of Labor that it has attempted to recruit domestic workers for the position, but that no such workers are available, and that temporary employment of a H2-B visa worker will not adversely affect the wage rates or working conditions of similarly employed domestic workers. *See* 8 C.F.R. §§ 214.2(h)(6)(iii)(A)-(D), 6(iv)(A). H2-B visas are limited to 66,000 per year.

H-4 visas are available to "the alien spouse and minor children" of a noncitizen entering under one of the other H visa categories. 8 U.S.C. § 1101(a)(15)(H); 8 C.F.R. § 214.1(a)(2).

**c. J Visa Category.**

The J visa category allows approved applicants to participate in work- and study-based cultural exchange visitor programs. *See* 8 U.S.C. § 1101(a)(15)(J). The regulations under this provision establish 15 categories of exchange program eligibility, including trainees, teachers, au pairs, and summer work and travel for foreign students. 22 C.F.R. §§ 62.1, 62.4. In order to qualify, visa applicants must be sponsored by designated entities, including governmental agencies, academic institutions, businesses, and non-profit organizations. *Id.* §§ 62.3, 62.5-62.13, 62.15. The J-2 visa is available to the spouse and children of an individual on a J-1 visa. 8 U.S.C. § 1101(a)(15)(J).

**B. Procedural Background.**

Plaintiffs challenge the issuance of the Proclamation and seek to enjoin it. Plaintiffs are comprised of Intrax, Inc. ("Intrax"), one of the country's leading operators of cultural exchange programs, and four separate associations – the National Association of Manufacturers, the United States Chamber of Commerce, the National Retail Federation, and TechNet (collectively "Associations") – whose members comprise hundreds of thousands of American businesses of all sizes and from a cross-section of economic sectors. Members of the Associations include companies such as Microsoft Corporation, Amazon.com, Gentle Giant Moving Company, Singing

Hills Landscape, Inc., Brummel Lawn & Landscape LLC, and Alliance Abroad Group. (*See* Compl. ¶¶ 164-81.)

Plaintiffs filed their complaint on July 21, 2020 alleging two claims for relief. The first seeks to invalidate the Proclamation based on the theory that it exceeds the authority of the executive branch (or constitutes *ultra vires* conduct) and the second count for violation of the Administrative Procedures Act ("APA") for implementation of the Proclamation by various Defendant departments.

On July 31, 2020, Plaintiffs filed their motion for a preliminary injunction. After full briefing on the motion and the submission of five briefs filed by amicus curiae, the Court held oral arguments on the motion on September 11, 2020.

For the reasons discussed below, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

## ANALYSIS

### A. Legal Standards Applicable to a Motion for Preliminary Injunction.

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). In order to obtain this extraordinary remedy, Plaintiffs must show "(1) they are likely to succeed on the merits, (2) they are likely to 'suffer irreparable harm' without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844-45 (9th Cir. 2020) (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). Where, as here, the government is a party, the public interest and the balance of equities factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Thus, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction.'" *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The Supreme Court's decision in *Winter*, however, did not disturb the precedent set by the Ninth Circuit's alternative analysis that a court may grant injunctive relief where "serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter*, 555 U.S. at 22). "For the purposes of injunctive relief, 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). Serious questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1952). Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits." *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985).

Whether a plaintiff can establish a likelihood of success on the merits or establishes serious questions going to the merits, that plaintiff is still required to show the likelihood of irreparable harm and that the public interest favors an injunction. *Cottrell*, 632 F.3d at 1135. Accordingly, the Court may grant a preliminary injunction "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

**B. Likelihood of Success on the Merits.**

**1. Defendants' Threshold Contentions Lack Merit.**

In order to prevail on their motion for a preliminary injunction, Plaintiffs bear the burden to demonstrate that they are likely to succeed on the merits of their underlying claims. However,



United States District Court
Northern District of California

United States District Court
Northern District of California

in opposing the motion, Defendants make several arguments to support their request that the Court deny the injunction: (1) Plaintiffs lack standing to bring their claims because they have not adequately alleged harm; and (2) the APA does not apply to Presidential action. Neither of Defendants' threshold arguments are convincing.

**a. Plaintiffs Have Standing to Request an Injunction.**

Defendants contend that Plaintiffs' claims challenging the Proclamation are precluded by their lack of standing. In order to establish that they have standing to pursue any claim challenging the Proclamation, Plaintiffs have the burden to demonstrate (i) that they suffered an injury-in-fact (ii) which resulted from the defendant's conduct and (iii) that a favorable ruling would redress the injury. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). An organization has standing to sue on behalf of its members where: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

Defendants argue that Plaintiffs lack standing because the Associations have only alleged vague descriptions of their members' harm and that none have any organizational interest related to immigration. Defendants argue Intrax lacks standing because it has merely alleged generalized economic harm that is not specifically tied to issuance of the Proclamation.

The Court finds these contentions entirely unpersuasive. Plaintiffs have filed eight declarations from the heads of the Associations and its constituent members outlining in detail the specific harms they have incurred and continue to incur as individual members and as organizations as a result of the Proclamation. (*See* Dkt. No. 31-36, Declaration of Jonathan Baselice ("Baselice Decl.") ¶¶ 4-12; Dkt. No. 31-37, Declaration of James Bell ("Bell Decl.") ¶¶ 5-17; Dkt. No. 31-38, Declaration of Zane Brown ("Brown Decl.") ¶¶ 4, 7-15; Dkt. No. 31-39, Declaration of Nicholas Brummel ("Brummel Decl.") ¶¶ 13-23; Dkt. No. 31-40, Declaration of Jack Chen ("Chen Decl.") ¶¶ 5-9, 11-42; Dkt. No. 31-42, Declaration of Stephanie Hall ¶¶ 7-8; Dkt. No. 31-43, Declaration of Mike Leman ("Leman Decl.") ¶¶ 5-6, 12-20; Dkt. No. 31-44,

United States District Court
Northern District of California

Declaration of Tom O'Gorman ("O'Gorman Decl.") ¶¶ 7-20.) Intrax has submitted its own declarations outlining the specific harms it has incurred as a result of the effectuation of the Proclamation. (*See* Dkt. No. 31-45, Declaration of Marcie Schneider ("Schneider Decl.") ¶¶ 7, 13-32, 39-43; Dkt. No. 69-7, Second Declaration of Marcie Schneider ("Second Schneider Decl.") ¶¶ 12, 13, 20, 25, 27.)

The ample record plainly belies the contention that the Associations have failed to establish that they and their members have interests adversely affected by the Proclamation that are germane to their purposes and are facing specific harms as a result of the imposition of the Proclamation and its effectuating guidelines. The record similarly belies Defendants' contention regarding the harm Intrax alleges it has suffered. Defendants' arguments to the contrary are not well taken. Plaintiffs have standing to pursue a preliminary injunction.[2]

**b. The APA Does Not Apply to Issuance of the Proclamation.**

Next, Defendants argue that Plaintiffs' request for injunctive relief must be denied because Plaintiffs have failed to challenge a discrete and final agency action under the APA. *See* 5 U.S.C. § 704. Plaintiffs' first claim for relief, which directly challenges the issuance of the Proclamation itself is not premised upon a contention that its issuance violates the APA. Defendants' argument that the Proclamation may violate the APA is a classic red herring and is, again, unpersuasive. Accordingly, Plaintiffs' failure to allege that the Proclamation is a final agency action is not fatal to their first claim for relief.

Defendants then argue that the APA does not permit judicial review of the Presidential action at issue here. *See, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding that it is black letter law that courts cannot review Presidential actions under the APA); *see also*

---

[2] Although Defendants did not argue justiciability in opposing the present motion, during the oral argument, counsel did allude to a contention that the Proclamation is not reviewable by the Court because the President has broad authority over the admission and exclusion of aliens as well as statutory discretion under 8 U.S.C. § 1182(f). The Court finds this argument unpersuasive. "Whatever deference we accord to the President's immigration and national security policy judgments does not preclude us from reviewing the policy at all." *Doe #1 v. Trump*, 418 F. Supp. 3d 573, 588 (D. Ore. 2019) (citing *Rostker v. Godberg*, 453 U.S. 57, 70 (1981) ("[D]eference does not mean abdication."); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role.")).

*Dalton v. Specter*, 511 U.S. 462, 468 (1994) ("The APA does not apply to the President."). Again, as Plaintiffs' direct challenge to the issuance of the Proclamation is not premised upon a theory that it violates the APA, Defendants' argument purporting to rebut that theory is unpersuasive.

**2. The Proclamation Exceeds Presidential Authority.**

At the preliminary injunction stage, Plaintiffs carry the burden to demonstrate that they are likely to succeed on the merits in proving their actual challenges to the Proclamation. *See, e.g., Gonzales v. O. Centro Espirita Beneficente UNIAO do Vegetal*, 546 U.S. 418, 429 (2006) (holding that "the burdens at the preliminary injunction stage track the burdens at trial.").

Here, the President issued the Proclamation pursuant to the authority delegated to him by Congress in 8 U.S.C. Section 1182(f) ("Section 1182(f)"). Plaintiffs contend that they are entitled to injunctive relief on the basis that the Proclamation is beyond the President's lawful authority under Section 1182(f), arguing that (1) the foreign affairs powers are limited in the context of a purely domestic decision; (2) the Proclamation unlawfully eviscerates portions of the INA; and (3) the text of the finding in the Proclamation itself, as well as the factual predicate upon which it is based, are inherently unsupported and fatuous.

The Court shall address each basis in turn.

**a. Domestic Affairs and Congressional Delegation of Power.**

Under our distinctly American system of government, the Constitution itself assigns to the branches of government their separate powers. Under Article I, section 8 of the United States Constitution, clause 3 gives Congress the power to "regulate Commerce with foreign Nations" and clause 4 provides that Congress shall establish a "uniform Rule of Naturalization." Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States," and clause 3 directs that the President "shall take Care that the Laws be faithfully executed."

Under this strict separation of powers, Congress has created a complex, highly reticulated set of immigration laws and regulations. Congress has legislated in the immigration arena since 1882. *See* An Act to Regulate Immigration, 22 Stat. 214 (1882). In its delineated legislative role, Congress has continued to establish policy regarding immigration in the United States including

the passage of the Immigration and Naturalization Act in 1952, and its later, significant amendments passed in 1965.

The INA establishes multiple grounds on which an alien abroad may be determined to be inadmissible to the United States and otherwise ineligible for a visa. *See, e.g.,* 8 U.S.C. § 1182(a)(1) (health-related grounds for exclusion); (a)(2) (criminal history grounds); (a)(3)(B) (terrorist activities); (a)(3)(C) (foreign policy grounds). In addition, Congress has delegated to the President the authority to suspend or restrict aliens under certain specific circumstances principally pursuant to Section 1182(f) of the INA.

Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem appropriate.

8 U.S.C. § 1182(f).

In its most recent decision concerning the spate of recent Presidential Proclamations in the immigration context and the proper roles of the coextensive branches of government, the Supreme Court observed that Section 1182(f) "exudes deference to the President." *Trump v. Hawaii*, -- U.S. -- , 138 S. Ct. 2392, 2408 (2018) ("*Hawaii III*"). When addressing the Presidential Proclamation seeking to bar entry by nationals from six predominantly Muslim countries ("Muslim Proclamation"), the Supreme Court found that, by its terms, Section 1182(f) "entrusts to the President the decisions whether and when to suspend entry ('[w]henever [he] finds that the entry' of aliens 'would be detrimental' to the national interest); whose entry to suspend ('all aliens or any class of aliens'); for how long ('for such period as he shall deem necessary'); and on what conditions ('any restrictions he may deem appropriate')." *Id.*

However, the Supreme Court also noted that calculus changes where the authority exercised by the President is outside the suspension of entry of aliens based on foreign policy interests. *See id.* at 2415. While the discretion to suspend entry of aliens into the United States is broad, "the substantive scope of this power is not limitless." *Doe #1 v. Trump*, 957 F.3d 1050,

1066 (9th Cir. 2020). In the Muslim Proclamation, the President "acted within the traditional spheres authorized by § 1182(f): in the context of international affairs and national security, and working in tandem with the congressional goals of vetting individuals from countries identified as threats through an agency review." *Id.* at 1067 (citing *Hawaii III*, 138 S. Ct. at 2409, 2412).

In contrast to the Muslim Proclamation that was before the Supreme Court in *Hawaii III*, the Proclamation here deals with a purely domestic economic issue – the loss of employment during a national pandemic. In "domestic economic matters, the national security and foreign affairs justification for policy implementations disappear, and the normal policy-making channels remain the default rules of the game." *Id.* This Court rejects the position that the Proclamation implicates the President's foreign affairs powers simply because it affects immigration. *See id.* (citing *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1279 (9th Cir. 2020) ("*East Bay*") ("Broadly citing to the Rule's immigration context is insufficient to invoke the foreign-affairs exception" so that the President does not have to follow the traditional pathways of public rulemaking)).[3]

The district court in *Doe #1*, a court within this Circuit, was the first to address the only other Presidential Proclamation in the history of the United States based solely on a change in domestic policy by invoking the delegation of powers in immigration to the President. In *Doe #1*, the court adjudicated the lawfulness of the Presidential Proclamation that requires applicants for immigrant visas to show proof of health insurance before they may enter the United States legally. After a thorough review of cases underlying the division of governmental powers in the field of

[3] A selection of law professors who teach and publish scholarship about United States immigration law submitted an amicus curiae brief to place the current dispute in the broader context and history of relevant immigration statutes. (*See* Dkt. No. 40.) In their brief, the law professors indicate that in every one of the over forty Proclamations issued in the United States since the delegation of power provision of Section 1182(f) was adopted in 1952, "presidential action had shown a specific nexus with the conduct of foreign governments." (*Id.* at 1 (citations omitted).) All past Presidents had issued such Proclamations with the basic understanding that "exercises of authority under § 1182(f) must connect to the United States' relations with foreign powers." (*Id.* at 2.) As the Court examines this Proclamation in the immigration context aimed to address purely domestic considerations, the amicus suggest that "[g]iven this lack of pedigree on past practice, this Court should scale back deference that it affords the current proclamation." (*Id.* at 7.)

immigration, the district court held that

> [w]hen Congress delegates authority to the President in the immigration context and that authority involves foreign relations or national security, especially in an emergency or extraterritorial context, then the nondelegation concerns are lessened because the President has his own inherent powers under Article II. That appears to be the intent of Congress in enacting the broad authority of § 1182(f). The Proclamation, however, uses § 1182(f) to engage in *domestic* policymaking, without addressing any foreign relations or national security issue or emergency. In this wholly domestic context, the delegation by Congress is without any intelligible principle and thus fails under the nondelegation doctrine.

*Doe #1*, 418 F. Supp. 3d at 592 (emphasis in original).

This Court agrees. Congress' delegation of authority in the immigration context under Section 1182(f) does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners. Such a finding would render the President's Article II powers all but superfluous. *See id.* at 592-93 ("[T]he text of Article I and more than two centuries of legislative practice and judicial precedent make clear, the Constitution vests Congress, not the President, with the power to set immigration policy. If the fact that immigrants come from other countries inherently made their admission foreign relations subject to the President's Article II power, then all of this law would be superfluous.").

Indeed, there must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative. Such unrestricted authority would be contrary to Congress' explicit delegation of powers in foreign affairs and national security. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (holding that the Supreme Court "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens."); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government . . . that the formulation of these polices is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *see also Youngstown Sheet & Tube Co. v.*

United States District Court
Northern District of California

*Sawyer*, 343 U.S. 579. 635-38 (1952) (Jackson, J., concurring) (holding that there is a significant distinction between presidential action that is authorized or compatible with Congressional enactments, as compared with "measures incompatible with the expressed or implied will of Congress"). Such unrestrained delegation in the context of immigration would plainly contradict the structural foundation undergirding the Constitutional separation of powers.[4]

On appeal regarding whether to stay the injunction of the Proclamation requiring proof of health insurance, the Ninth Circuit agreed with the district court that in "domestic economic matters, the national security and foreign affairs justification for policy implementations disappear, and the normal policy-making channels remain the default rules of the game." *Doe #1*, 957 F.3d at 1066. The operative section of the legislation delegating power to the President implicates only his dominion over foreign relations and national security specifically in the context of an emergency or extraterritorial issue. The Congressional delegation of power "does not provide the President with limitless power to deny visas to immigrants based on purely long-term economic concerns" or "purely domestic economic problem[s]." *Id.* at 1065, 1067. Because the Proclamation at issue here as well "deals with a purely domestic economic problem," the Proclamation does not implicate "the President's foreign affairs powers" and "his power is more circumscribed when he addresses a purely domestic economic issue." *Id.* at 1067 (citations omitted). These holdings are binding on this Court.[5]

---

[4] To the extent Defendants contend that the only limit to Presidential authority under Section 1182(f) in the domestic arena is any finding that the entry of visa applicants "would be detrimental to the interests of the United States," the Court shall address that contention *infra* in Section B3 of this Order. However, the Court maintains that Defendants' contention that *any* finding is sufficient in this purely domestic context would constitute an unrestrained delegation of legislative power and would therefore be an invalid application of the statute. *See, e.g., Whitman v. American Trucking Ass'ns,* 531 U.S. 457, 474 (2001) (holding that where a statute provides no guidance for the exercise of discretion or that has "conferred authority to regulate an entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition,'" such a statute must be stricken as invalid).

[5] In a recent decision, however, the district court in the District of Columbia, finding no support in the statutory text, did not adopt the foreign/domestic distinction addressed in the district court's decision and approved by the Ninth Circuit in *Doe #1*. *See Gomez v. Trump,* --- F. Supp. 3d ---, 2020 WL 5367010, at *19 (D.D.C. Sept. 4, 2020); *see also Panda v. Wolf,* --- F. Supp. 3d ---, 2020 WL 5545554, at *4 (D.D.C. Sept. 16, 2020). Although granting a partial injunction of the Proclamation requiring proof of healthcare insurance for some visa applicants on other grounds, the District of Columbia district court respectfully declined to adopt the reasoning in *Doe*

Accordingly, the Court concludes that Plaintiffs have satisfied their burden to demonstrate that they are likely to prevail on the merits or, in the alternative, have demonstrated serious questions going to the merits of their claim that the issuance of the Proclamation is invalid based on the limitation on the power to issue Presidential proclamations in the context of a purely domestic economic issue.

**b. The Proclamation Unlawfully Eviscerates Portions of the INA.**

In addition to finding that executive power is reviewable and somewhat curtailed in the context of a purely domestic economic issue, the Court also finds that Congress did not delegate authority to eviscerate portions of the statute in which the Congressional delegation of power was made. Logic would so dictate. The basic tenets of statutory construction require that a court reject an interpretation of a statute which renders entire portions of the remainder of the statute invalid. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.") (internal quotation marks omitted).

Here, the broad authority delegated to the President must be examined within the statutory framework of the INA. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Section 1182(f), while providing the President with broad authority, does not permit him to "indefinitely nullify[] Congress's considered judgments on matters of immigration." *Hawaii v. Trump*, 878 F.3d 662, 680 (9th Cir. 2017) ("*Hawaii II*"). Although the Supreme Court found that the Muslim Proclamation did not conflict with the INA, the Court did acknowledge the widely accepted premise that Section 1182(f) "does not give the President authority to countermand Congress's considered policy judgments." *Hawaii III*, 138 S. Ct. at 2410. The Court specifically held that Section "1182(f) does not allow the President to override particular provisions of the INA." *Id.*

---

*#1*. *Gomez*, 2020 WL 5367010, at *19. This decision is not binding. Instead, this Court adopts the holding in the district court opinion in *Doe #1* and, further, it is compelled to follow the binding approval of its underlying reasoning by the Ninth Circuit. *See Doe #1*, 418 F. Supp. 3d at 592; 957 F.3d at 1067.

The Proclamation at issue here nullifies significant portions of the remainder of the INA, by declaring invalid statutorily-established visa categories in their entirety for the remainder of this calendar year and indefinitely beyond that deadline.[6] Here, rather than supplementing the INA's existing provisions, the Proclamation eviscerates whole categories of legislatively-created visa categories. Until, at a minimum, the end of the year, the Proclamation simply eliminates H-1B, H-2B, L-1, and J-1 visas and nullifies the statutes creating those visa categories. The Proclamation, by its explicit terms, rewrites the carefully delineated balance between protecting American workers and the need of American businesses to staff their operations with skilled, specialized, and temporary workers.

By way of example, according to the existing statutory scheme, the H-2B visa category requires that a visa only be issued "if unemployed persons capable of performing [the necessary temporary] service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *see also* 8 C.F.R. § 214.2(h)(6)(iv)(A). That safeguard is achieved through a careful and robust certification process overseen by the Department of Labor, in which the employer must "certify . . . that there is an insufficient number of U.S. workers who are qualified and who will be available for the job opportunity." 20 C.F.R. § 655.50(b). Even after such certification, the employer retains the continuing responsibility to "provide employment to any qualified U.S. worker who applies." *Id.* § 655.20(t). The pre-existing law already guarantees that issuance of an H-2B visa will not disadvantage American native-born workers. Regardless, the Proclamation eviscerates the visa category in its entirety.

[6] The indeterminate end date of the Proclamation is also legally suspect. Although by its terms, the effective termination date of the Proclamation is December 31, 2020, it provides that the end date may be extended indefinitely at the discretion of the President and his appointees. Section 1182(f) authorizes the President to suspend entry "for such period as he shall deem necessary." "It follows that when a President suspends entry in response to a diplomatic dispute or policy concern, he may link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition." *Hawaii III*, 138 S. Ct. at 2410. The Supreme Court found the Muslim Proclamation had established procedural safeguards by requiring an ongoing assessment and reporting process every 180 days from covered nations. *Id.* In the Proclamation at issue before this Court, however, there are no such procedural safeguards and no set end date. *See Doe #1*, 957 F.3d at 1065 (holding that the Proclamation's "perfunctory time limitations do not comport with the textual limits of § 1182(f)" and is therefore "distinguishable from the Proclamation at issue in *Hawaii*").

Similarly, the preexisting statutory structure seeks to balance the needs of American business and American labor. With regard to positions filled by H-1B visa holders, available to skilled foreign workers "in specialty occupation[s]," Congress tailored the requirements for highly skilled workers for this category of work visa. 8 U.S.C. § 1101(a)(15)(H)(i)(b). The statute requires that any American employer sponsoring such a visa applicant attest that the wages paid for H-1B workers will not undercut wages paid to native-born workers; that H-1B employees' working conditions will not adversely affect those of American workers; and that the employer had provided notice of its plan to hire H-1B employees to any relevant domestic union representative, or otherwise posted conspicuous notice. *Id.* §§ 1182(n)(1)(A)-(C). Indeed, over time, Congress has further calibrated the worker visa program to ensure that American workers and businesses are advantaged rather than threatened by the addition of highly skilled labor positions and leadership to meet the needs of the United States economy.

Defendants contend that the Proclamation does not override provisions of the INA, but rather is an expression of the President's power to impose additional restrictions on immigration in a time of national emergency in the domestic economy caused by the pandemic. Citing *Hawaii III*, Defendants argue that Section 1182(f) "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." 138 S. Ct. at 2408. Defendants contend there is nothing unusual about the exercise of the Presidential power under Section 1182(f) to ban entry of foreigners on the basis that they might otherwise be admissible under other provisions of the INA.

However, the Court in *Hawaii III* found that the there was no "conflict between the statute and the Proclamation." *Id.* at 2411. Rather, the Court found that the visa program at issue established valid criteria for nationals to enter from some low-risk countries and that the program "did not implicitly foreclose the Executive from imposing tighter restriction on nationals of certain high-risk countries." *Id.*; *id.* at 2421 n.6 (same). In *Hawaii III*, the Supreme Court found that the President was acting within his authority because the Proclamation was consistent with the INA and filled in spaces where the statute was otherwise silent. *Id.* at 2411-12.

The work visa provisions of the INA at issue here provide a finely reticulated statutory scheme. This scheme reflects a set of legislative judgments that the entry of international workers is in the national interest provided they enter the market under the specific terms and conditions provided by the statute. Unlike the Muslim Proclamation, here, the President's wholesale elimination of categories of workers does not supplement this legislative judgment but rather explicitly supplants it by refusing admission to all categories of foreign workers. Use of the Presidential Proclamation power cannot "eviscerate[] the statutory scheme" by reversing course on legislatively enacted policy in its entirety. *See Doe #1*, 957 F.3d at 1064; *see also Hawaii III*, 138 S. Ct. at 2411; *Hawaii II*, 878 F.3d at 685.

Accordingly, the Court concludes that Plaintiffs have satisfied their burden to demonstrate that they are likely to prevail on the merits or, in the alternative, have demonstrated serious questions going to the merits of their claim that the issuance of the Proclamation is invalid based on the finding that it unlawfully eviscerates portions of the INA.

**3. The Finding is Insufficient as a Matter of Law and Contradicted by the Text of Proclamation.**

The sole prerequisite set forth in Section 1182(f) for the President to act is for him to "find" that the entry of the covered visa applicants "would be detrimental to the interest of the United States." 8 U.S.C. § 1182(f). In the Muslim Proclamation, the Supreme Court held that the President had "undoubtedly fulfilled that requirement" when he ordered the "DHS and other agencies to conduct a comprehensive evaluation of every single country's compliance with the information and risk assessment baseline." *Hawaii III*, 138 S. Ct. at 2408. The President then "issued the Proclamation setting forth extensive findings" to support the position that the six predominantly Muslim countries whose nationals he sought to bar from entry could pose a risk to the United States. "Based on that review, the President found that it was in the national interest to restrict entry of aliens who could not be vetted with adequate information – both to protect national security and public safety, and to induce improvement by their home countries." *Id.* at 2408-09. On the basis that the President had made these findings, the Supreme Court held that the Muslim Proclamation comported with the requirements of Section 1182(f).

In this matter, however, there is no record whatsoever that the President or any federal agencies at his instruction conducted any evaluation regarding the effect on the domestic economy of banning work-related nonimmigrant visas at issue here. Rather, and as Defendants affirmed during the hearing in this matter, the entirety of the President's finding is located within the text of the Proclamation itself. In the text of the Proclamation, the President states that he

> determined that, without intervention, the United States faces a potentially protracted economic recovery with persistently high unemployment if labor supply outpaces labor demand.
>
> In addition, pursuant to Proclamation 10014, the Secretary of Labor and the Secretary of Homeland Security reviewed nonimmigrant programs and found the present admission of works within several nonimmigrant visa categories also poses a risk of displacing and disadvantaging United States workers during the current recovery.

85 Fed. Reg. at 38,263. Although facially the President's determination appears to be a finding as required by Section 1182(f), there is nothing proffered in the record that any such reviews were made by the Secretaries of Labor or Homeland Security, and no reports of any sort that a specific determination was made that nonimmigrant visa applicants had any deleterious effect on the United States economy or American citizens' employment rates.[7]

---

[7] The extensive record proffered by Plaintiffs indicates precisely the opposite. A select group of leading companies and business organizations submitted an amicus curiae brief summarizing its position that "while the Administration suggests its actions have "clear[ed] the American job market of competition," no evidence supports this. In reality, based on numerous studies and experience of *amici*, the impact on American workers, businesses, and the economy more broadly will be adverse, enduring, and irreparable." (Dkt. No. 45-1, Amicus Brief at 7-8.)

After the issuance of the Proclamation, many of America's leading companies denounced the change in policy as harmful to innovation and growth, especially in the context of the COVID-19 pandemic. For instance:

> Facebook recognized that "[h]ighly-skilled visa holders play a critical role in driving innovation," which is "something we should encourage, not restrict." Uber unequivocally stated the suspension "will hurt American businesses." Apple CEO Tim Cook said he was "[d]eeply disappointed by [the] proclamation" adding "[T]his nation of immigrants has always found strength in our diversity, and hope in the enduring promise of the American dream. There is no new prosperity without both." Microsoft President Brad Smith observed: "[n]ow is not the time to cut our nation off from the world's talent or create uncertainty and anxiety." Google CEO Sundar Pichai, a first-generation immigrant, was similarly "[d]isappointed," recognizing that "[i]mmigration has contributed immensely to America's economic success" and "ma[de] it a global leader in tech." And

The Proclamation contains language tending to demonstrate that, as a result of the COVID-19 pandemic, the country is suffering terrible economic effects and job loss in the sectors affected by the visa categories at issue. By way of example, the Proclamation provides that "between February and April of 2020, more than 17 million United States jobs were lost in industries in which employers are seeking to fill worker positions tied to H-2B nonimmigrant visas." *Id.* at 38,263-64. And further, that "more than 20 million United States workers lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions." *Id.* at 38,264. The Proclamation states that "the May unemployment rate for young Americans, who compete with certain J nonimmigrant visa applicants, has been particularly high." *Id.* The Proclamation recognizes that "[h]istorically, when recovering from economic shocks that cause significant contractions in productivity, recoveries in employment lag behind improvements in economic activity" and "assuming the conclusion of economic contraction, the United States economy will likely require several months to return to pre-contraction economic output, and additional months to restore stable labor demand." *Id.*

However, in reality, there remains a significant mismatch of facts regarding the unemployment caused by the proliferation of the pandemic and the classes of noncitizens who are barred by the Proclamation. The statistics regarding pandemic-related unemployment actually indicate that unemployment is concentrated in service occupations and that large number of job vacancies remain in the area most affected by the ban, computer operations which require high-skilled workers. (*See* Dkt. No. 31-1, Declaration of Paul W. Hughes ("Hughes Decl.") Exs. 14, 31; *see also* Dkt. No. 81-1.) These jobs are simply not fungible. Further, the Proclamation bars entry of noncitizens who are already prevented, by statute, from competing with jobs for United States citizens. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). The actual process required in order to fill

---

> PayPal CEO Dan Schulman warned that the suspension "will slow our progress as a nation" by blocking "current employees [who are] looking to bring their talents to the U.S." and depriving American businesses of "talented individuals who are filling roles that would otherwise remain vacant."

(*Id.* at 8 (internal citations omitted).)

an open position with an H-2B visa applicant requires a certification process culminating in the Department of Labor making an affirmative finding that "there is an insufficient number of U.S. workers who are qualified and who will be available for the job opportunity." 20 C.F.R. § 655.50. In addition, the Proclamation has the effect of barring seasonal temporary labor even in instances in which an employer is unable to fill open positions with American workers during the pandemic. (*See* Leman Decl. ¶ 9; O'Gorman Decl. ¶ 12.)

The Presidential finding in the text of the Proclamation, such as it is, is not supported by any review or report proffered by Defendants. Rather, although its stated purpose is to aid the domestic economy by providing job opportunities for United States citizens, the Proclamation completely disregards both economic reality and the preexisting statutory framework. Furthermore, without any consideration of the impact on American firms and their business planning, the Proclamation abruptly changed the scope of immigration policy in the United States. (*See* Chen Decl. ¶¶ 6, 14-19 (setting out examples of interests unexpectedly upset by the issuance of the Proclamation); Brown Decl. ¶ 14 ("Like other Fortune 100 companies, Amazon builds its business plans around short-term and long-term goals. Many L-1 transfers from overseas operations were planned prior to the COVID-19 pandemic, and the transferees were expected to help implement Amazon's operational growth plans."); Bell Decl. ¶ 9.) This lack of predictability necessary for basic business governance and planning is contrary to the stated purpose of promoting American business in order to provide employment opportunities for United States citizens.

Accordingly, the Court concludes that Plaintiffs have satisfied their burden to demonstrate that they are likely to prevail on the merits or, in the alternative, have demonstrated serious questions going to the merits of their claim that the issuance of the Proclamation is invalid based on the determination that the finding set out in the text of the Proclamation is insufficient as a matter of law, it does not comport with actual facts, and lastly, it does not address the alleged problem it purports to address.

**4. The Court Need Not Address the Second Cause of Action.**

Because the Court has found that the Proclamation is unlawful, Defendants lack lawful

United States District Court
Northern District of California

authority to implement the Proclamation's provisions. *See, e.g.*, *City of Los Angeles v. Barr*, 941 F.3d 931, 938 (9th Cir. 2019) ("When an agency is charged with administering a congressional statute, 'both its power to act and how it is to act are authoritatively prescribed by Congress.' An agency 'literally has no power to act . . . unless and until Congress confers power upon it.") (quoting *City of Allington v. FCC*, 569 U.S. 290, 297) (2013); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). It is clear that "the officers who attempt to enforce the President's directive" may be enjoin[ed]." *Hawaii II*, 878 F.3d at 680 (quoting *Franklin*, 505 U.S. at 828 (Scalia, J., concurring)). Because the Court finds that the issuance of the Proclamation here was contrary to law, its enforcement and implementation by Defendants is similarly unlawful. Accordingly, the Court does not address Plaintiffs' second claim for relief pursuant to the APA.

**C. Irreparable Harm.**

In addition to the requirement that a movant for a preliminary injunction must establish a likelihood of success on the merits, the movant must also demonstrate that it will suffer irreparable harm in the absence of an injunction. *See Winter*, 555 U.S. at 20. "It is well established" that "monetary injury is not normally considered irreparable." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Irreparable harm is "harm for which there is no adequate legal remedy." *East Bay*, 950 F.3d at 1280; *see also Stuhlbarg Int'l v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (upholding an injunction where the irreparable injury alleged was loss of customers and accompanying goodwill and revenue).

Plaintiff Associations and their members and Intrax have submitted evidence that their businesses have and will likely continue to suffer harm as a result of the limitation on their ability to hire and retain qualified individuals from abroad. These injuries have or will result in the disruption of business operations, interference with existing employees, the closing of open positions, the furlough or laying off of employees, substantial pay cuts, threatened loss of prospective customers, shutting down of entire programs, inability to make capital investments, and the likelihood that some businesses or cultural programs will have to cease operations altogether. (*See, e.g.*, Baselice Decl. ¶¶ 9-12; Chen Decl. ¶¶ 6-9, 19, 23-28; Brown Decl. ¶¶ 8-15; Leman Decl. ¶¶ 15-19; O'Gorman Decl. ¶¶ 16-19; Schneider Decl. ¶¶ 7, 29, 31, 43; Bell Decl. ¶¶

United States District Court
Northern District of California

3, 5, 7, 17; Brummel Decl. ¶ 21; Second Schneider Decl. ¶ 26.)

In response to this plethora of evidence of injury, Defendants contend that the harms were not actually caused by issuance of the Proclamation, but rather were caused by the advent of the COVID-19 pandemic. Defendants argue that the hiring practices of Plaintiffs and their members were harmed by the effects of the pandemic and the suspension of processing in visas generally caused by the closures of United States consular posts worldwide. This is patently false. First, many of the consulate offices have reopened but continue not to process the banned visas. (*See* Second Schneider Decl. ¶¶ 5-6, 8-9; Dkt. No. 69-6, Declaration of William Gustafson ("Gustafson Decl.") ¶¶ 4, 5.) Second, it is true that nearly every American business has been injured by the pandemic and the consular posts have indeed slowed their processing of visa applications. However, the irreparable injuries alleged by Plaintiffs – as specifically detailed by evidence they submitted – were and continue to be a result of the blanket elimination of the specific categories of work-related nonimmigrant visas at issue in this case. The stated intent of the Proclamation itself was to bar the entry of nonimmigrants. The evidence detailing the injuries caused by that bar is clearly in the record before this Court.

Next, Defendants contend that there are exceptions to the scope of the Proclamation, if an employer can demonstrate that any particular applicant falls with a national-interest exception. In this regard, Defendants argue that, under certain circumstances pursuant to the State Department's Guidance dated August 21, 2020 ("Guidance"), employees may (or may not) be eligible for an exception to the ban on these visa categories. Defendants contend that because Plaintiffs have not proffered evidence that any specific member company or association has applied for such an exception and were refused, Plaintiffs have failed to demonstrate immediate irreparable injury and their claims of injury are merely speculative.

First, applying for a national-interest exception in the recent Guidance is expensive, a cost that would be borne by the Plaintiff applicant. (*See* Second Schneider Decl. ¶ 18.) Second, to the extent the Guidance could serve to relieve some of the effects of the Proclamation on certain individuals, an exception to the policy that might be possibly available to a few applicants, does not relieve the irreparable injury to the remainder of the Plaintiffs whose employees would not

qualify. (*See* Second Schneider Decl. ¶¶ 10-25; Gustafson Decl. ¶ 7.) Furthermore, the claim that a policy does not cause harm because there are exceptions to the policy is a logical fallacy.

Accordingly, the Court concludes that Plaintiffs have satisfied their burden to demonstrate that they will continue to suffer irreparable harm in the absence of an injunction.

**D. Balance of Equities and Public Interest.**

When adjudicating an injunction in which the government is a party, the factors of balance of equities and public interest merge. *See Drakes Bay Oyster*, 747 F.3d at 1092. The Court finds that it is in the public interest to respect Congressional judgments on purely domestic issues related to immigration. *See East Bay*, 950 F.3d at 1281 ("[T]he public has an interest in ensuring that the 'statutes enacted by [their] representatives are not imperiled by executive fiat.'") (internal citation omitted). Further, based on actual facts in the record, the Court finds that the public interest is served by cessation of a radical change in policy that negatively affects Plaintiffs whose members comprise hundreds of thousands of American businesses of all sizes and economic sectors. The benefits of supporting American business and predictability in their governance will inure to the public.

Accordingly, the Court concludes that Plaintiffs have satisfied their burden to demonstrate that the balance of equities and the public interest favor an injunction.

**E. No Security Required for the Injunction.**

Pursuant to Federal Rule of Civil Procedure 65(c), the Court finds in its discretion that it is not proper to impose any security for the preliminary injunction because (1) there has been no request for a bond; (2) a significant public interest at stake; and (3) there is no evidence that Defendants will suffer damages as a result of the injunction. *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868-69 (N.D. Cal. 2018) (citing *Johnson v. Couturier*, 472 F3d 1067, 1086 (9th Cir. 2009) (finding that the district court retains discretion "as the amount of the security required, *if any*")); *see also Connecticut Gen. Life Ins. Co. v. New Images Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (holding that the district court is afforded wide discretion in the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction).



United States District Court
Northern District of California

**F. Scope of Relief of the Injunction.**

Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *East Bay*, 950 F.3d at 1282 (citation omitted). Here, Plaintiffs seek to enjoin application of the Proclamation against their members. Plaintiffs do not seek, and the Court does not grant, a "nationwide" injunction of the Proclamation. *See Hawaii III*, 138 S. Ct. at 2424-25 & n.1 (noting that "nationwide" injunction is a misnomer and explaining that there is no issue where plaintiffs only seek an injunction for themselves) (Thomas, J., concurring).

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants, their agents, servants, employees, and all others in active concert or participation with them are enjoined, pending final judgment, from implementing, enforcing, or otherwise carrying out Section 2 of Proclamation 10052 with respect to Plaintiffs and, with respect to the association Plaintiffs, their members.

2. Defendants, their agents, servants, employees, and all others in active concert or participation with them are enjoined, pending final judgment, from engaging in any action that results in the non-processing or non-issuance of applications or petitions for visas in the H, J, and L categories which, but for Proclamation 10052, would be eligible for processing and issuance, with respect to the Plaintiffs and the members of the Plaintiff associations.

3. This preliminary injunction shall take effect immediately and shall remain in effect pending trial in this action or further order of this Court.

**IT IS SO ORDERED.**

Dated: October 1, 2020

Jeffrey S White

JEFFREY S. WHITE
United States District Judge